IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re ) | |
| ) | |
| MARMC TRANSPORTATION, INC., ) | Case No. 10-20653 |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| MARMC TRANSPORTATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Adv. No. 11-2002 |
| ) | |
| MONSTER HEAVY HAULERS, LLC, ) | |
| ) | |
| Monster. ) | |

FILED
3:19 pm, 11/13/12
Tim J. Ellis
Clerk of Court

**OPINION ON SECOND AMENDED COMPLAINT**

On July 17, 2012, this matter came before the court for an evidentiary hearing on the Second Amended Complaint filed by MarMc Transportation, Inc. ("MarMc") and the Answer filed by Monster Heavy Haulers, LLC ("Monster"). Thereafter, the court held hearings regarding submission of Mark Richardson's ("Mark")[1] deposition testimony and closing arguments. Upon a review of the record, testimony, evidence and parties' arguments, the court is prepared to rule.

**Jurisdiction**

This court has jurisdiction of this matter under 28 U.S.C. §§ 1334 and

---

[1] The court does not mean any disrespect or familiarity with the individuals. As there are numerous individuals with the surname of "Richardson," the court will use their first name for ease of identification.

157(b)(2)(E).[2]

**Findings of Facts**

MarMc began operating an oilfield transportation company and fabrication facility in 1989. MarMc's geographical operations occurred in the Rocky Mountain and Western states area with its principal place of business located in Casper, Wyoming. Mark and Cindy Richardson ("Cindy") are MarMc's shareholders. Each own fifty percent of MarMc's shares. Mark is the President. Cindy is the Vice President. After the Richardsons separated in 2002 and subsequently divorced in 2008, Mark was responsible for MarMc's day-to-day management and operations. During the time period between 2002 until late 2009, Cindy does not appear to have been actively involved in the business. She testified that she signed all documents sent to her, never questioning the transactions as she was assured by MarMc's comptroller, that "everything was fine." Mark was the manager and operated MarMc at this time. Mark moved to Louisiana in "maybe late 2006" or "2007" for personal reasons.

Cindy became re-involved in the business operations of MarMc in October or November, 2009. At that time, Donny Richardson ("Donny"), Mark's brother and an employee of MarMc, contacted Cindy informing her that MarMc did not have funds to pay its bills, including payroll taxes, mortgage payments, fuel and licensing fees for the trucks. Subsequently, MarMc filed for bankruptcy protection on June 3, 2010. Mark, as

---

[2] Unless otherwise indicated, all future statutory reference are to the Bankruptcy Code, Title 11 of the United States Code.

President and joint shareholder, consented to MarMc filing for bankruptcy protection. Since filing the bankruptcy petition, Cindy has been responsible for submitting the monthly operating reports to the Bankruptcy Court and MarMc's day-to-day operations.

According to Anthony Cook's ("Cook") testimony, he met Mark at the end of 2006 while Cook was working for Stallion Oil Field Services. Mr. Cook and Mark developed a professional relationship.

Cook and Maxim Doucet ("Doucet") originally formed Monster in November, 2008, in Louisiana for the purpose of purchasing and operating tug boats in connection with oil production activity. For reasons not relevant to the case before the court, that business "never got off the ground." The purpose of the business was modified to transporting land based oil rigs from drilling and well sites. Monster operates primarily in Pennsylvania, Texas, Mississippi, and Oklahoma. Mr. Cook testified that Mark approached him toward the end of 2008, proposing that MarMc become part owner of Monster. MarMc, through Mark, initially proposed cash as its capital contribution. The agreement was that in return for the cash contribution, MarMc would own twenty-five percent of Monster. On March 6, 2009, as Monster did not receive any payments from MarMc, Cook, Doucet and Lucas Simone executed the Amended and Restated Operating Agreement of Monster Heavy Haulers ("Amended Operating Agreement"), each having a membership interest of 30%, 30% and 10%, respectively.

Mark and Cook testified that throughout this time period there was a continuing

agreement that MarMc would become part owner of Monster by contributing cash, and later, MarMc's contribution was changed to the "in kind" contribution of rolling stock and equipment. The agreement never was consummated as, initially, MarMc could not put together the cash contribution, and later, could not provide the clear titles to the rolling stock and equipment pledged as MarMc's contribution to Monster.

Mark's deposition testimony reflects that he did not disclose that MarMc did not have clear title of the rolling stock. Upon being questioned by MarMc's counsel, his testimony reflects:

> Question: "So my question has been what is the compensation that MarMc was to receive for the use of this rolling stock on those Pennsylvania projects?"
>
> Answer: "Well, this is where it boils down to I probably wasn't totally truthful with these people."
>
> Question: "...What do you mean? What were you not truthful –"
>
> Answer: "Well, I made them believe that I could furnish a clear title."[3]

Mark's testimony reflects that the rolling stock was encumbered by liens from Wells Fargo.

After this bankruptcy case was filed and upon court approval, MarMc sold nine trucks, eight trailers and a loader to Monster, for the amount of $1,310,000.00.[4]

**Discussion**

---

[3] Deposition Testimony of Mark Richardson, Pg. 39, Lines 9 -17.

[4] Case Docket Numbers 50 and 61.

Page 4

MarMc, as a debtor-in-possession, has all the rights and powers of a trustee serving in a Chapter 11 case.[5] MarMc alleges the following: (1) Monster failed to turnover accounts receivables for services and/or goods that MarMc provided to Monster; (2) Monster breached the lease agreement, failing to pay monthly rent to MarMc for the use of its rolling stock and equipment; (3) Monster has been unjustly enriched at MarMc's expense; (4) Monster's use of MarMc's assets constitutes a fraudulent transfer pursuant to § 548; and, (5) MarMc's transfers of assets to Monster were fraudulent transfers pursuant to 11 U.S.C. § 544(b) and Wyo. Stat. § 34-14-205.

The first issue that this court must determine is whether Louisiana or Wyoming law is applicable. The parties provided a list of controverted issues on Pretrial Order which included, " Whether Wyoming or Louisiana law applies to the issues in this case." Neither party argued the application of either Louisiana or Wyoming law to the substantive issues involved in this adversary proceeding, but simply applied Wyoming law.[6]

Upon a review of the "choice of law" principles, the court is directed by the

---

[5] § 1107(a).

[6] The parties submitted a proposed Pretrial Order with a laundry list of "Contested Issues of Law," including "j. Whether Wyoming or Louisiana law applies to the issues of this case." At the pretrial hearing, the court modified the Pretrial Order, to include, "The parties are ordered to submit simultaneous briefs regarding issue "h" & "j" as related to jurisdiction." Thereafter, the parties filed a "Joint Motion for Clarification," asserting that due to the broadly worded scope of paragraphs 6(g) and (j), the parties could not determine what the Court would like briefed. The court finding that the parties were not able to narrow the issues that they brought before the court, but rather using a "shot-gun approach" listing numerous broad issues for this court to determined, vacated its order for the parties to submit briefs. At this time, the court shall apply Louisiana and Wyoming law, unless there is specific statutory or case law directing choice of law to the issues.

Restatement of Law addressing Conflict of Laws ("Restatement").  Generally, a court must follow the direction of its legislature and apply local statutory provisions directed to choice of law.  However, as stated in the Restatement, it is not always apparent which law to apply and courts are faced with the question whether the issue before it falls within the intended range of application of a particular statute.  When there is no adequate directives in the statute or in the case law, the court takes into account the following, non-exclusive factors, to determine the issue: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, the protection of justified expectations; (d) the basic policies underlying the particular field of law; (e) certainty, predictability and uniformity of result; and, (f) ease in the determination and application of the law to be applied.[7]

The United States Supreme Court determined the court must follow the choice of law principles of the forum state for an issue involving a contract.[8]  Accordingly, this court applies Wyoming choice of law rules.  The Tenth Circuit held that "Under Wyoming choice of law rules, the law of the state chosen by the parties to govern their contract presumptively applies."  The court's review of the Master Equipment Lease Agreement ("Lease") reflects that the parties agreed that the Lease is governed by the

---

[7] Restatement (Second) of Conflict of Laws § 6 (1971).

[8] *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, (1941).

"application of the laws of the State of Louisiana." Therefore, this court shall apply the Louisiana state law regarding the breach of contract claim.

As the parties did not develop their positions regarding the choice of law regarding the remaining issues, and this court does not find a specific statutory or case law directive, the court shall apply both Louisiana and Wyoming law to the other issues involving state law.

(1) <u>Turnover of accounts receivables</u>

MarMc asserts that Monster did not pay numerous accounts receivable invoices due and owing to MarMc in the total amount of $461,002.31; and that Monster should be ordered to turn over the property of the estate. A bankruptcy estate includes all legal or equitable interests of a debtor's property as of the commencement of the case.[9] The existence and extent of such an interest is determined by state law.[10]

The Bankruptcy Code provides for the turnover of property to the estate, stating:

> "...an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee except to the extent that such debt may be offset..."[11]

A party bringing a cause of action has the burden of production at trial as well as

---

[9] § 541.

[10] *In re Taylor*, 133 F.3d 1336 (10th Cir 1998).

[11] §542(b).

the burden of persuasion with respect to each element of an asserted cause of action. If that party satisfies its burden, the burdens of production and of persuasion shift to the party asserting an affirmative defense to prove its defense.[12]

MarMc asserts non-payment of the following invoices:

| Invoice No./Exhibit No. | Amount |
|---|---|
| 9245/Ex. 1 | $    2,147.99 |
| 9594/Ex. 2 | 161,732.40 |
| 9635/Ex. 3 | 175,518.99 |
| 9822/Ex. 4 | 17,694.93 |
| 9851/Ex. 5 | 143,853.36 |
| 9986/Ex. 6 | 49,553.00 |
| 9991/Ex. 7 | 22,750.00 |
| **Total** | $461,002.31[13] |

MarMc's right to payment for the following invoices is controverted:

(i) <u>Invoice No. 9245/Ex. 1</u>. Helen Stoneking ("Stoneking"), bookkeeper for MarMc, testified that this invoice was based on one of MarMc's drivers going to help a driver employed by Redbird Express LLC's ("Red Bird"). It was her understanding that at some point, Monster purchased Red Bird. Therefore Monster was responsible for the invoice. Contrarily, Cook testified that this invoice was for services incurred by Red Bird, prior to the Monster becoming operational; that Monster had not received any benefit for these services and did not owe the payment.

The court's review of the invoice reflects that the invoice is dated

---

[12] *Moore v. Kulicke & Soffa Indiustries, Inc.*, 318 F.3d 561, 566 (3d Cir. 2003).

[13] MarMc adjusts the amount owed, crediting Monster with a payment of $80,000.00, received on or about May 17, 2010.

Page 8

November 18, 2008. This time period is prior to the time that Monster became operational in March, 2009. The court finds that Monster is not responsible for the payment of this invoice.

(ii)  Invoice No. 9594/Ex. 2.[14] Ms. Stoneking testified that this invoice has not been paid. She further testified that Mark had modified the amount, reducing it to $100,000.00, but she did not change the invoice amount "in the system." Mark's deposition testimony reflects that he reduced the amount of the invoice, but he knew "of no reason why the amount that [he] reduced it to shouldn't have been paid."

Mr. Cook testified that this was one of three trucks that Mark had ordered from Acadiana Mac. Mark was attempting to sell the vehicles, but the sale "fell through." Thereafter, Mark asked Monster to pay Acadiana Mac for the truck and get title of the truck. However, Cook did not provide any documentation in support of his testimony.

The court finds that the testimony of Stoneking is supported by the deposition testimony of Mark; that the invoice was reduced by Mark, acting in his capacity as President and manager of MarMc; and payable to the MarMc in the amount of $100,000.00.

(iii) Invoice No. 9635/Ex. 3[15] Ms. Stoneking testified that this invoice was not paid and was modified by Mark to an amount of $125,000.00. Mark's testimony supports Ms. Stoneking, in that the truck was "rigged up" for Monster and the total amount reduced by his authority. Therefore the amount due and owing is $125,000.00

(iv) Invoice No 9822/Ex. 4[16] Ms. Stoneking testified that upon her review, this invoice has not been paid and is billed to Monster. Mr. Cook testified that this would have been paid by a wire transfer without providing specific wire transfer evidence.

The court's review of the evidence does not find a wire transfer in the amount of the invoice near the time period that this invoice is dated. Therefore,

---

[14] Mark's deposition testimony discusses deposition Exhibit 8 that is cross referenced to Trial Exhibit 2.

[15] Mark's deposition exhibit 7.

[16] Mark's deposition exhibit 5.

Page 9

the amount is due and owing.

(v) <u>Invoice No. 9851/Ex. 5</u>[17] Ms. Stoneking testified that this invoice was not paid and was for wages, labor, etc. for February, March and April 2009. Mr. Cook testified that Monster's portion in the amount of $120,000.00 was paid by wire transfer. The balance, those months of January and February should have been billed to Red Bird.

    The court finds that based upon its inability to match a wire transfer for any payment from the evidence presented, nor did Monster provide supporting documents, the total amount is due and owing.

(vi) <u>Invoice no. 9986/Ex. 6</u>[18] Ms. Stoneking testified that this invoice reflects "items picked up and taken to Louisiana" by Monster. This testimony is supported by Mark's deposition testimony. Monster did not present controverted testimony regarding this issue. Therefore, the amount is due and owing to MarMc.

(vii) <u>Invoice No. 9991/Ex. 7</u>[19] Mr. Cook conceded that the invoice has not been paid. Therefore, the amount is due and owing to MarMc.

In conclusion, based upon the above findings, the court finds that Monster shall turn-over to MarMc the total amount of $458,851.00 for account receivable invoices due and owing.

(2) <u>Breach of lease agreement</u>

MarMc alleges Monster violated § 542 for failing to turn over property of the estate resulting from a breach of the Lease. MarMc alleges Monster is in default of the Lease, having failed to pay the monthly rental amounts for the use of MarMc's rolling

---

[17] Mark's deposition exhibit 6.

[18] Mark's deposition exhibit 4.

[19] Mark's deposition exhibit 3.

stock and equipment.

The court determined above that Louisiana law is applicable to this breach of contract allegation. The United States District Court for the Eastern District of Louisiana, provides the standards for interpreting a contract:

> "In Louisiana, 'contracts have the effect of law for the parties.' La. Civ.Code art. 1983. Under La.Civ.Code art. 2045: "Interpretation of a contract is the determination of the common intent of the parties." The interpretation of an unambiguous contract is an issue of law for the court to decide. *Amoco Production Co. v. Texas Meridian Resources Exploration Inc.*, 180 F.3d 664, 668 (th Cir. 1999). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent." La.Civ.Code art.2046. "In addition, a contract provision is not ambiguous where only one of two completing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Texas EasternTransmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).
>
> A contract is ambiguous under Louisiana law "when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction. *Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F. 3d 425, 429 (5th Cir. 1996). Relevant rules of construction include interpreting each provision in light of other provisions so that each is given meaning suggested by the entire contract, interpreting provisions susceptible of different meanings so as to not to ignore them, and interpreting contracts in ways that leads to unreasonable consequences or inequitable or absurd results even when the language used is explicit. *Texas Eastern, supra.*
>
> "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages and the conduct of the parties before and after the formation of the contract..." La.Civ.Code art. 2053. "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its test." La.Civ.Code art. 2055. *Guilbeau v. C & D Reprographics-Lafayette, Inc.*, 568 So.2n 206 (La.App.

1990), writ denied, 571 S.2d 653 (La.1990)."[20]

This court's review of the Lease indicates, in part:

- the Lease was executed by Mark Richardson on behalf of MarMc; and by George Anthony Cook, on behalf of Monster on April 1, 2010;

- the effective date of the Lease is stated as April 1, 2009;

- a "Lease Schedule" was to be attached to the Lease, but was not;

- rent was to be paid for each vehicle "in advance on the same day of each calendar month and continue monthly until termination of this Lease or any Schedule...;"

- Lessee was responsible for expenses including but not limited to: fuel taxes, sales and use taxes, maintenance of the leased equipment, licenses and plates.

The Second Circuit of the Court of Appeal of Louisiana determined when parol evidence is admissible, stating,

"Parol evidence is not admissible to prove a collateral agreement which is inconsistent with the written contract, it is admissible to supply a patent deficiency in the contract. This rule is particularly applicable to situations where the contract is silent regarding an essential term or a term that the parties would necessarily have considered."[21]

The court, having reviewed the Lease, determines that the words of the contract are not clear nor explicit, requiring a further search of the parities' intent. This is not based upon competing interpretations of the Lease, but the fact that an essential term of

---

[20] *Ingraham v. Planet Beach Franchising Corporation*, Civil Action No. 07-3555 Section "C" (3); 2009 U.S. Dist. LEXIS 27411 (E.D. LA, Apr. 1, 2009).

[21] *Southern Hardware Co., Inc. v. Honeywell Information Systems*, 373 So.2d 738 (LA App., 2nd Circuit, 1979).

Page 12

the contract is missing. Upon reviewing the Lease, the court is uncertain as to MarMc's and Monster's intentions after applying established rules of construction. The court's interpretation of each provision reveals that it is not possible for the court to determine the monthly rental rate, based upon the review of the Lease. The Lease is silent regarding an essential element of consideration, i.e. the monthly rent amount.

Therefore, the court considers the testimony of Mark and Cook. Each testified that a schedule was intentionally not attached as there was never any intent that Monster would pay monthly rent for the use of the rolling stock. Monster's use of the rolling stock was based upon MarMc's contribution for ownership of Monster. Each testified that the parties entered into the Lease for the purpose of providing Monster a means by which to insure and license the rolling stock and equipment during the period, as MarMc did not have the resources to do so. The court finds that Mark, as president and manager of MarMc during this period of time, authorized Monster's use of the rolling stock and equipment. The court also finds that the testimony of the parties involved in the transaction did not intend that Monster would pay MarMc a monthly rental rate for the use of the equipment. This court finds that the Lease is patently deficient as the "Schedule" is not attached to the Lease to allow the parties or the court to determine the monthly rental amount. The Lease is not enforceable against the Monster. Therefore, the court finds against MarMc and for Monster.

(3) Unjust enrichment

MarMc alleges that it is entitled to restitution from Monster for the use of MarMc's assets as Monster has been unjustly enriched pursuant to § 541(a)(1) and (7). MarMc's claim for unjust enrichment is included as property of the bankruptcy estate. MarMc alleges Monster violated § 542 for failure to turn over this property of the estate.

The required elements of an unjust enrichment claim under Louisiana law are: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) no other available remedy at law.[22] The court finds that MarMc did not allege, cite or argue Louisiana law, relying instead on Wyoming unjust enrichment law. The court's review and application of the facts to Louisiana law finds that Monster was justified in using the MarMc rolling stock based upon the authority of MarMc's president and manager, Mark. Additionally, Monster's use of the rolling stock was premised upon the rolling stock was to be MarMc's capital contribution for an ownership share of Monster, which fell through as MarMc did not provide clear title to the rolling stock as pledged. Therefore, the court finds in favor of Monster and against MarMc for a claim of unjust enrichment under Louisiana law.

Under Wyoming law, the elements of unjust enrichment are: (1) valuable services were rendered, or materials furnished; (2) to the party to be charged; (3) which services

---

[22] *O'Gea v. Home Depot USA, Inc.,* Civil Action No. 08-4744, 2009 U.S. Dist. LEXIS 29189 (E.D. LA, Mar. 20, 2009).

or materials were accepted, used and enjoyed by the party to be charged; and (4) that the services or materials were furnished under such circumstances as would reasonably notify the party to be charged, in rendering such services or furnishing such materials, expected to be paid by the party to be charged. Without such payment, the party would be unjustly enriched.[23]

The court finds that the MarMc did not meet the fourth element. MarMc, through its acting manager and president provided the rolling stock and equipment to Monster as MarMc's capital contribution for a twenty-five percent interest in the ownership of Monster. MarMc did not have an expectation of payment for Monster's use of its rolling stock, as evidence by the testimony of Cook and Mark. Mark specifically stated in response to questions from MarMc's counsel:

Question: "What was the purpose of moving all that rolling stock to Pennsylvania?

Answer: The purpose was to get MarMc into part ownership of Monster."

MarMc would have been granted an ownership interest in Monster, but for its failure to provide the clear titles. Other than an ownership interest, MarMc did not have any expectation of payment for Monster's use of the rolling stock. The court finds that the MarMc did not meet the elements for unjust enrichment under either Louisiana or Wyoming law.

---

[23] *Jacoby v. Jacoby*, 2004 WY 140 (Wyo. 2004), citing *Nuhome Investments, LLC v. Weller*, 2003 WY 171 (Wyo. 2003) and *Boyce v. Freeman*, 2002 WY 20 (Wyo. 2002).

(4) <u>Fraudulent transfer pursuant to § 548</u>

MarMc alleges that it may avoid the transfer of assets to Monster and recover the value of the transfer under § 550.

The Bankruptcy Code provides that,

> "The trustee may avoid any transfer of an interest of the debtor in property, incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition if the debtor voluntarily or involuntarily–
> (i) received less than a reasonably equivalent value in exchange for such transfer...and
> (ii)(I) was insolvent on the date that such transfer was made...or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debt that would be beyond the debtor's ability to pay as such debts matured[24]...or"

The trustee may recover the property transferred, or its value, from the initial transferee or the entity for whose benefit the transfer was made.[25]

To establish an avoidable transfer under § 548(a)(2), MarMc bears the burden of proof on a two-pronged test: (1) establishing that MarMc received less than a reasonably equivalent value; and, (2) that the transfer was made while MarMc was insolvent or caused insolvency; resulted in unreasonably small capital; or, was made while MarMc

---

[24] § 548(a) (1)(B).

[25] §550(a).

intended to incur debts beyond its ability to pay.[26]

In analyzing this section, the Louisiana Bankruptcy Court found in *In re Goldberg*,

> "The three subsections of 11 U.S.C. § 548(a)(2)(B) are alternatives to one another, any one will satisfy prong two. However, if the plaintiff cannot establish receipt of less than reasonably equivalent value, insolvency is irrelevant, as neither prong can stand alone.
>
> Before determining whether a debtor received less that reasonably equivalent value, the trial court must figure out what reasonably equivalent value is, or would have been in the particular circumstance."[27]

This court must first determine what a reasonably equivalent value "is or would have been," for Monster's use of MarMc's rolling stock. Donny testified, providing an hourly rate for each piece of equipment used by the Monster. He also testified that the value could be determined by multiplying that rate by 10 hour days; 20 working days per month and the number of months the vehicle was in Louisiana. However, Donny's own testimony revealed that it was typical that a "piece of equipment was not used every day" Mark testified that one of the reasons he had moved some of MarMc's fleet to Louisiana was because the trucks were sitting idle in Wyoming due to a down-turn in the economy. Donny confirmed that part of MarMc's equipment was idle in Wyoming "beginning in 2009."

---

[26] *In re Goldberg*, 277 B.R. 251 (M.D. LA, 2002).

[27] *Id.* at 261.

Page 17

Donny asserted that if the vehicles in Louisiana had been available to him, he could have taken them to North Dakota and put the vehicles to work. However, he also testified that MarMc had 16 pieces of equipment available to it at that time and did not take that equipment to North Dakota. Additionally, Donny testified that because the trucks were uninsured and unlicensed, they were not able to be used for jobs.

The court finds Donny's testimony regarding the supposed values that MarMc may have received were speculative and unsupported by his own testimony and that of Mark. The vehicles would not have been used every day and the down turn in the economy does not support the values that Donny stated as reasonably equivalent value or would have been, at the time the vehicles were taken to Louisiana by MarMc. Additionally, the one resonating fact that the court continues to "bump up against" is that Mark Richardson, as manager and president of MarMc authorized Monster's use of the vehicles for the purpose of purchasing and 25 percent interest in Monster. Mark was to provide clear title on the vehicles but failed to do that. Therefore, the cause of action fails as MarMc failed to prove this element. MarMc has not carried its burden and the court finds against the MarMc and for the Monster.

(5) Fraudulent transfers pursuant to §544(b) and Wyo. Stat. §34-14-205

MarMc alleges that MarMc's transfers of assets to Monster were fraudulent transfers under § 544(b) and Wyo. Stat. § 34-14-205.

The Bankruptcy Code provides,

"the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured clam that is allowed under section 502, or that is not allowable only under section 502(e) of this title.[28]

Wyoming law provides,

"A transfer made or obligation incurred by the debtor is fraudulent as to the creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
  (i)   With actual intent to hinder, delay or defraud any creditor of the debtor; or
  (ii)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
        (A)  Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
        (B)  Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."[29]

As this court has already determined that, based upon the speculative values provided to the court by MarMc, it can not determine a reasonably equivalent value. Therefore, the court the court finds against MarMc and for Monster.

In conclusion, the court finds:

(1)   for MarMc and against Monster regarding the claim of Turnover of accounts receivables in the amount of $458,851.00;

---

[28] §544(b)(1).

[29] Wyo. Stat. 34-14-205(a).

(2) against MarMc and for Monster regarding the claim of breach of the lease agreement;

(3) against MarMc and for Monster regarding the claim of unjust enrichment;

(4) against MarMc and for Monster regarding the claim of fraudulent transfer pursuant to §548; and

(5) against MarMc and for Monster regarding the claim of fraudulent transfer pursuant to §544(b) and Wyo. Stat. §34-14-205.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

DATED this __13__ day of November, 2012

By the Court

_____
HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
Stephen Winship
Brad Hunsicker
Eric Nelson